```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED: _Apr 16, 2013_
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :

DAVID WINTERS,                           :

                  Plaintiff,          :           10 Civ. 7571 (JMF)

            -v-                 :          OPINION AND ORDER

UNITED STATES,                    :

               Defendant.      :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     Former federal prisoner David Winters, proceeding *pro se*, brings this action pursuant to

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, for negligence and

medical malpractice by prison officials during his incarceration at the Federal Correction

Institution in Otisville, New York ("FCI Otisville").[1]  Defendant moves for dismissal of some

claims on the ground that the Court lacks jurisdiction, and summary judgment on the remaining

claim.  For the reasons discussed below, Defendant's motion is granted.

## BACKGROUND

     Plaintiff was, until 2011, a federal inmate, having been sentenced to thirty-five years'

imprisonment in 1977 for kidnapping by use of a firearm and aiding and abetting the same.

(Colvin Decl. ¶ 24 (Docket No. 65); *id.* Ex. A (Docket No. 65-1)).  Plaintiff states that, during

his incarceration, he "set records filing grievances," having filed "[s]omewhere in the

neighborhood" of 300 or 400 grievances in total.  (Connolly Decl. (Docket No. 64) Ex. A

---

[1]     Plaintiff filed the initial Complaint in this action on February 18, 2009 (Docket No. 1),
and, approximately three months later, filed an Amended Complaint (Docket No. 9), which
appears intended to supplement, but not replace, the initial Complaint.  Mindful of Plaintiff's *pro
se* status, the Court will consider the Complaint and Amended Complaint together as the
operative pleading, and address the facts and claims contained in both.

(transcript of deposition of David Roy Winters, Feb. 7, 2012), at 43:11-22 (Docket Nos. 64-1 &
64-2)).  Winters was transferred to FCI Otisville in or around August 2007.  (Colvin Decl. Ex. A,
at 1).  On January 17, 2008, prison staff at the facility discovered an anonymous "drop note" in
the Health Services Unit, apparently left by an inmate who resided with Winters in the "GA"
housing unit.  (Am. Compl. 2; Colvin Decl. Ex. B (Docket No. 65-2)).[2]  The drop note indicated
that Winters was plotting to escape, and threatened that Winters would be hurt if not moved out
of the GA unit.  (Colvin Decl. Ex. C (Docket No. 65-3)).

That same day, Winters was placed in protective custody so that prison officials could
conduct a threat assessment, which included searches of Winters's cell and other areas of the
prison, as well as interviews of Winters and inmates residing in the GA unit.  (*Id.* Ex. B, at
WINTERS_00240-41; Connolly Decl. Ex. B (Docket No. 64-3) ¶ 4).  Winters told prison staff
that "[t]here is nothing going on" and that "if anyone wanted to hurt me . . . they would have hurt
me already."  (Colvin Decl. Ex. B, at WINTERS_00240).  Upon completing the threat
assessment the next day, prison officials returned Winters to the GA unit.  (Colvin Decl. Ex. B,
at WINTERS_00241; Connolly Decl. Ex. C (Docket No. 64-4) ¶ 5).

More than three months after discovery of the drop note, on April 30, 2008, Winters was
attacked by, and subsequently fought with, another inmate in the GA unit, Raul Landeros.
(Colvin Decl. Ex. D (Docket No. 65-4)).  Landeros had arrived at FCI Otisville on January 30,
2008, several weeks after the drop note had been discovered.  (Colvin Decl. ¶ 25).  According to
Winters, "tension" existed between them because Landeros was not satisfied with some legal
work that Winters had performed for him.  (Connolly Decl. Ex A, at 142:8-145:15).  Prison
surveillance cameras show that, early on the morning of April 30, Landeros heated a cup of

---

[2]     The Amended Complaint states that the drop note was found in January 2007 (*see* Am.
Compl. 2), but the evidence makes clear that it was January 2008 (*see* Colvin Decl. Ex. B).

liquid in a microwave in the GA unit's common area and then threw it onto Winters.  (Colvin

Decl. Ex. D, at WINTERS_00009; *see also* Pl.'s Aff. 4 (Docket No. 69)).  Winters did not report

the incident immediately.  Instead, approximately twenty minutes later, he and Landeros got into

a fight in the common area; a third inmate intervened.  (Colvin Decl. Ex. D, at

WINTERS_00009; Connolly Decl. Ex. A, at 121:1-123:2).  A corrections officer, Niala

Ingrassia, was handling laundry in the Unit GA Office at the time of the fight; upon hearing

noise, she entered the common area and found Winters with blood on him.  (Colvin Decl. Ex. D,

at WINTERS_00007).  She ordered the prisoners to lock in, secured the door, and called for

assistance to respond to the fight.  (*Id.*).  In an affidavit attached to his Complaint, and at his

deposition, Winters alleged that Ingrassia was negligent in failing to respond more quickly (*Id.*

Ex. A, at 67:5-68:3); in his opposition papers, Winters alleges for the first time that she

intentionally left the common room to facilitate the attack on him.  (Pl.'s Opp'n 2).

FCI Otisville medical staff examined Winters approximately thirty-five minutes after the

fight, and determined that he had suffered first degree burns to his nose, chin, and chest, as well

as a laceration above his left eye.  (Colvin Decl. Ex. F (Docket No. 65-6)).  The medical staff

dressed Winters's burns, closed the laceration, and prescribed medication immediately, until

Winters could be seen by the clinical director, Dr. Diane Sommer, later that day.  (*Id.* Exs. F, G

(Docket Nos. 65-6 & 65-7)).  Dr. Sommer prescribed a topical ointment for the burns, counseled

Winters on wound care, and prescribed Tylenol and Codeine for pain.  (*Id.* Ex. G).  Winters was

examined five times in the following week, and twice the week after.  (*See id.* Exs. H, I, J, K, L,

M, N (Docket Nos. 65-8 to 65-14)).  Clinical encounter reports from these examinations indicate

that medical staff cleaned and dressed the wounds and counseled Plaintiff on wound care, that

Winters stated that he was following the staff's instructions regarding wound care, and that the

wounds were healing properly.  (*Id.*).  At a follow-up examination on May 22, 2008, Winters

expressed concern that his burns might be infected.  (*Id.* Ex. P (Docket No. 65-16)).  Medical

staff examined Winters and noted that while there was some slight discharge from his chest

wound, his wounds were healing properly.  (*Id.*).

    That same day, Winters wrote a letter to Dr. Sommer, in which he stated that she and her

staff were "doing a marvelous job putting (Humpti Dumpti) me, back together again."  (*Id.* Ex. Q

(Docket No. 65-17)).  In the same letter, however, Winters requested outside hospitalization.

(*Id.*).  In a written note dated the next day, Dr. Sommer informed Winters that his wounds did not

require outside hospitalization and that the discharge he was experiencing was normal.  (*Id.* Ex.

R (Docket No. 65-18)).  Winters had follow-up examinations by medical staff on May 29 and 31,

2008.  (*Id.* Ex. S (Docket No. 65-19)).  On July 10, 2008, following Winters's request for

additional bandages to clean and cover his chest wound, the medical staff determined that his

wound had healed and did not require constant cleaning or covering.  (*Id.* Ex. T (Docket No. 65-

20)).  Instead, Winters was directed to keep the area clean with soap and water.  (*Id.*).

## DISCUSSION

    Plaintiff's Complaint and Amended Complaint, liberally construed, raise four claims:

(1) negligent failure to protect Winters by returning him to the GA unit after discovery of the

drop note; (2) negligent failure to post warnings that microwaves would be removed from FCI

Otisville if used as weapons; (3) negligence on Ingrassia's part in failing to respond more

quickly to the fight; and (4) medical malpractice.  The claims concerning Winters's return to the

GA unit and the failure to post warnings concerning the microwaves must be dismissed because

they fall within the Discretionary Function Exception ("DFE") to the FTCA's waiver of

sovereign immunity, and thus this Court lacks subject matter jurisdiction to hear them.  The

claims concerning Ingrassia's response to the fight also fall within the DFE, and, in the alternative, are not supported by any evidence.  Winters's medical malpractice claim also fails due to, among other things, his failure to support the claim with expert medical testimony.[3]

## A.  Legal Standards

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to hear the case. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)), *aff'd on other grounds*, 133 S. Ct. 721 (U.S. 2013).  In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd on other grounds*, 130 S. Ct. 2869 (2010) (citations and internal quotation marks omitted). Moreover, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits."  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance

---

[3]     Arguably, the Complaint and Amended Complaint also raise tort claims for conduct in violation of the Eighth Amended and Equal Protection Clause.  (Compl. 2-3, 4, 6, 8; Am. Compl. 3).  Any such claim, however, is subject to dismissal because the United States has not waived sovereign immunity for constitutional torts.  *See F.D.I.C. v. Meyer*, 510 U.S. 471, 477-78 (1994); *see also Guzman v. United States*, No. 11 Civ. 5834 (JPO), 2013 WL 543343, at *11 (S.D.N.Y. Feb. 14, 2013) ("The United States has not waived its immunity with respect to claims that its employees have committed constitutional torts." (citation and internal quotation marks omitted)).

of the evidence." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, that demonstrate the absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322.  In ruling on a motion for summary judgment, a court must view "all the evidence in the light most favorable to the non-movant and draw[ ] all reasonable inferences in that party's favor." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support or in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in

6

evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).[4]

It is well established that the "special solicitude" afforded to *pro se* litigants extends to the opposition to a motion for summary judgment. *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Thus, a *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to raise the strongest arguments that they suggest. *See, e.g.*, *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011). This special solicitude is not unlimited, however, and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation mark omitted). Nor is the "duty to liberally construe a plaintiff's [opposition] . . . equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (quoting 2 Moore's Federal Practice § 12.34[1][b], at 12-61 (internal quotation marks omitted)).

## B.  Plaintiff's Claims Concerning the Fight

The United States, as a sovereign, "is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Liranzo*, 690 F.3d at 84 (quoting *United States v. Mitchell*, 445 U.S. 535, 538, (1980)); *accord Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004). In the FTCA, Congress enacted "a limited waiver . . . [of] sovereign immunity [that] allows for a tort suit against the United States under specified circumstances." *Liranzo*, 690 F.3d at 85 (quoting *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (internal quotation marks omitted)).

---

[4]     Although Rule 56 of the Federal Rules of Civil Procedure was amended and reorganized in 2010, the advisory committee notes indicate that "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

The FTCA's waiver of immunity, however, is qualified by several exceptions, including the

DFE, which provides that the United States retains its immunity for "[a]ny claim . . . based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty

on the part of a federal agency or an employee of the Government, whether or not the discretion

involved be abused."  28 U.S.C. § 2680(a); *see In re World Trade Ctr. Disaster Site Litig.*, 521

F.3d 169, 190 (2d Cir. 2008).  Where the DFE applies, it follows that a court lacks subject matter

jurisdiction to hear the claim.  *See, e.g.*, *Fazi v. United States*, 935 F.2d 535, 537 (2d Cir. 1991)

(citing *Dalehite v. United States*, 346 U.S. 15, 30-36 (1953)).

The Supreme Court has explained that the DFE "marks the boundary between Congress'

willingness to impose tort liability upon the United States and its desire to protect certain

governmental activities from exposure to suit by private individuals."  *United States v. S.A.*

*Empresa de Vicao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).  Its purpose

is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in

social, economic, and political policy through the medium of an action in tort."  *United States v.*

*Gaubert*, 499 U.S. 315, 323 (1991) (citation and internal quotation mark omitted); *accord In re*

*World Trade Ctr. Disaster Site Litig.*, 521 F.3d at 190.  Thus, the DFE "precludes claims based

on day-to-day management decisions if those decisions require judgment as to which of a range

of permissible course is the wisest."  *Ortiz v. United States*, No. 01 Civ. 4665 (AKH), 2002 WL

1492115, at *2 (S.D.N.Y. July 11, 2002) (citing *Gaubert*, 499 U.S. at 325).

More specifically, to fall within the DFE, "(1) the acts alleged to be negligent must be

discretionary, in that they involve an element of judgment or choice and are not compelled by

statute or regulation, and (2) the judgment or choice in question must be grounded in

considerations of public policy or susceptible to policy analysis."  *USAA Cas. Ins. Co. v.*

8

*Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111-12 (2d Cir. 2012) (quoting

*Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000)).  An act is "discretionary" if it is

not "compelled by statute or regulation" — that is, if an employee has some "rightful option"

other than to "adhere to the directive" of a statute or regulation.  *Gaubert*, 499 U.S. at 322

(quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  Whether an act is "grounded in

considerations of public policy or susceptible to policy analysis" is evaluated based on "the

nature of the actions taken," not "the agent's subjective intent in exercising the discretion."  *Id.* at

325.  If a statute or regulation confers discretion, "it must be presumed that the agent's acts are

grounded in policy when exercising that discretion."  *Id.* at 324.

Applying these standards here, Winters's first three claims must be dismissed for lack of

jurisdiction.  First, with respect to the drop note claim, it is well established that while the Bureau

of Prisons ("BOP") has a statutory duty to "provide suitable quarters and provide for the

safekeeping, care, and subsistence" of inmates, 18 U.S.C. § 4042(a)(2), decisions about how to

safeguard prisoners are discretionary, *see, e.g.*, *Enigwe v. Zenk*, No. 03-CV-854 (CBA), 2007

WL 2713849, at *8 (E.D.N.Y. Sept. 14, 2007) (collecting cases).  Put another way, because

Section 4042 "does not set forth the particular manner by which the BOP must fulfill this duty,"

it "leaves judgment or choice to the BOP officials."  *Ortiz*, 2002 WL 1492115, at *3 (citation and

internal quotation marks omitted).  The decision "whether to return to his housing unit an inmate

whose need for protective custody turned out to be unsubstantiated," (Connolly Decl. Ex. D (64-

5) ¶ 9 (Decl. of J.M. Killian, Warden of FCI Otisville)), is also plainly "susceptible to policy

analysis," *see Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (finding that

prison officials' decision to return an inmate to the general population from a segregated housing

unit, after investigating a threat to his safety from other inmates, fell within DFE as both

discretionary and 'susceptible to policy analysis'").  As the Warden of FCI Otisville explained, it

requires consideration of many factors, including "the safety of inmates and correctional facility

workers, the security and good order of the correctional facility, and the wise use of institutional

resources."  (Connolly Decl. Ex. D ¶ 9).  As the Court held (with respect to the same facility) in

*Ortiz*, "decisions as to which inmates should be separated and which inmates should be placed in

administrative detention or more closely monitored involve a balancing of a number of public

policy considerations including the inmate safety, the ability of inmates to move about the

facility, general concerns for prison security, and the effective use of limited resources."  *Ortiz*,

2002 WL 1492115, at *4; *cf. Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (finding

that in prisons, "to decide what steps to take in response to a reported threat, an officer must set

priorities among all extant risks: the risk presented by the reported threat, along with the other

risks that inevitably arise in a prison" and that "[t]hose types of decisions implicate social and

public-policy considerations").  Thus, the decision to return Winters to the GA unit is therefore

covered by the DFE.

Similarly, Winters's claim concerning prison officials' failure to post notices on

microwaves, warning that they would be removed if used as weapons, is subject to the DFE.

There is no statute or regulation that requires the posting of such notices, let alone mandates the

removal of the microwaves, leaving such decisions to the discretion of prison officials.

(Connolly Decl. Ex. D ¶¶ 3-4); *cf. Alfrey*, 276 F.3d at 565 (finding that in the absence of

regulations concerning the search of prisoners' cells, the scope and manner of search is left to the

discretion of individual corrections officers); *Brotman v. United States*, 111 F. Supp. 2d 418,

422, 424 (S.D.N.Y. 2000) (finding that the decision to post warning signs in a national park

rested in the discretion of the National Park Service).  Such decisions are also subject to policy

analysis, as Defendant has explained in its supporting declarations.  Among other things, they

involve considerations of (1) the utility of the microwaves to prisoners, who can supplement

their meals with food purchased at the prison commissary; (2) the rarity with which microwaves

are used as weapons; (3) the fact that prison officials cannot threaten to remove everything that

might be used as a weapon because prisoners make weapons out of almost anything; and (4) the

unrest that would be caused by the removal of the microwaves.  (Connolly Decl. Ex. D ¶ 5); *cf.*

*Alfrey*, 276 F.3d at 565 (finding that the scope and manner of a search were "susceptible to

policy analysis" because the officers had to balance "the potential risk, on the one hand, against

the inmate's interest in being free from overly intrusive searches, on the other" in light of the

"particular threat presented and the practicalities of the situation"); *Whisnant v. United States*,

400 F.3d 1177, 1182 (9th Cir. 2005) (citing cases for the proposition that decisions regarding the

manner of warnings posted in parks are covered by the DFE).  Thus, Winters's claim concerning

the microwaves must also be dismissed for lack of jurisdiction.

Lastly, Plaintiff's claim concerning Ingrassia's response to the fight also falls within the

DFE.  As courts in this Circuit have held, corrections officers responding to prison fights act with

discretion based upon their judgment and experience.  *See Banks v. United States*, No. 10 Civ.

6613 (GBD) (GWG), 2011 WL 4100454, at *13 (S.D.N.Y. Sept. 15, 2011) ("[T]here is no

question that [the correction officer's] conduct [breaking up a fight between two inmates] was

the product of a 'judgment or choice.'"), *report and recommendation adopted*, 2011 WL

5454550 (S.D.N.Y. Nov. 9, 2011); *Chen v. United States*, No. 09-CV-2306 (ARR), 2011 WL

2039433, at *7 (E.D.N.Y. May 24, 2011) (finding that Section 4042 "does not compel an officer

to act in a particular way when supervising inmates or when confronted with inmate-on-inmate

violence" and that "federal regulations governing the protection and discipline of inmates are

discretionary in nature"), *aff'd sub nom. Qin Chen v. United States*, 494 F. App'x 108 (2d Cir.

2012).  These decisions are also inherently susceptible to policy analysis, as, when presented

with prisoner fights, guards must "make an on-the-spot assessment of how best to resolve" the

situation, a decision that "logically involve[s] considerations of economy, efficiency, and

safety."  *Banks*, 2011 WL 4100454, at \*14 (internal quotation marks omitted); *see also id.*

("Courts have consistently held that the decision as to how to respond to inmate violence is one

grounded in policy considerations." (collecting cases)); *Chen*, 2011 WL 2039433, at \*8

("[P]rison officials' decision about how best to respond to violence between inmates implicate

policy considerations.").

There is an argument — albeit one not made by Plaintiff (except for a conclusory

reference in an unauthorized sur-reply affidavit) — that this claim falls within an exception to

the DFE known as the "negligent guard theory," in which case the Court would have jurisdiction

pursuant to the FTCA.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475-77 (2d Cir.

2006) (per curiam) (discussing the negligent guard theory).  In that event, however, the claim

would fail for lack of evidence.  First, to the extent that Winters's claim is for negligent failure to

prevent the fight, he does not allege, let alone present any admissible evidence to show, that

Ingrassia had any reason to believe that an attack had occurred or that a fight was imminent.[5]  In

fact, at his deposition, Winters admitted that he did not inform prison officials about his first

---

[5]     Plaintiff makes conclusory allegations in his opposition to the motion for summary
judgment that Ingrassia was normally not in the back office and that she conspired with his
attackers, but these unsworn allegations are unsupported by any admissible evidence and thus
insufficient to defeat summary judgment.  (Pl.'s Opp'n 2-3).  *See* Fed. R. Civ. P. 56(c)(4)
(requiring that affidavits in support or opposition to summary judgment motion "set out facts that
would be admissible in evidence"); *see also* 10B Wright and Miller, Federal Practice and
Procedure § 2738 (3d ed.) ("[U]ltimate or conclusory facts and conclusions of law, as well as
statements made on belief or 'on information and belief,' cannot be utilized on a summary-
judgment motion.").

altercation with Landeros, despite ample opportunity to do so before the subsequent fight. (Connolly Decl. Ex. A, at 122:3-13).  To the extent Winters's claim is premised on Ingrassia's response to the fight as it occurred, his case is even weaker, as the record makes clear that Ingrassia responded to the fight quickly and that other prison guards received a call to respond to the fight almost immediately.  (*See id.* at 135:22-25 (Winters stating that Ingrassia arrived to break up the fight as a floor buffer was thrown at him for the second time); Colvin Decl. Ex. D, at WINTERS_00009 (indicating that the floor buffer was thrown at Winters the second time one minute and twenty-one seconds after the fight began); *id.* at WINTERS_00006-00008 (indicating that other officers received a call for help within moments of the beginning of the fight)).

## C.  Plaintiff's Medical Malpractice Claims

Winters's final claim is for medical malpractice, which is subject to New York law.  *See, e.g.*, *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997) ("The liability of the federal government under the FTCA is generally determined by state law." (internal quotation marks omitted)); *see also* 28 U.S.C. § 1346.  Under New York law, "'unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'"  *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (quoting *Keane v. Sloan-Kettering Inst. for Cancer Research*, 464 N.Y.S.2d 548, 549 (App. Div. 2d Dep't 1983)); *see also Shields v. United States*, 446 F. App'x 325, 326 (2d Cir. 2011) (applying *Sitts* to a medical malpractice claim brought by an incarcerated plaintiff appearing *pro se*).  Acts of malpractice falling within the "competence of a lay jury to evaluate" must be "so clear and obvious that it will be within the understanding of the ordinary layman without the need for

expert testimony" — such as when a dentist pulls the wrong tooth or when a patient undergoing surgery to a particular body part incurs an injury to a different body part. *Sitts*, 811 F.2d at 740.

Applying that rule here, Winters's medical malpractice claim fails for lack of any expert testimony in support.  Plaintiff's claim is premised on a dispute over the proper course of care — namely, whether additional or different medications should have been prescribed (Connolly Decl. Ex. A, at 57:19-59:22, 62:7-63:20), whether Winters should have been transferred for outside hospitalization while his burns healed (*id.* at 60:14-22), and whether Winters should have been seen my medical staff more regularly (*id.* at 61:12-13, 63:21-64:14).  These acts are not "so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony."  *Sitts*, 811 F.2d at 740.  Yet Winters has failed to adduce any expert testimony concerning the proper standard of care.  In any event, the record makes clear that FCI Otisville provided substantial care to Plaintiff.  He was seen by medical staff within only thirty-five minutes of the fight for treatment of his injuries and by the clinical director later that day. (Colvin Decl. Exs. F & G).  He was further examined and treated five times the following week, and twice the week after, including specific responses to concerns he raised and a determination that his wounds were healing properly and that outside hospitalization was not necessary.  (*Id.* Exs. H, I, J, K, L, M, N, P, Q, R).  Plaintiff has failed to produce any admissible evidence to show how this substantial care was deficient.  For both of these reasons, his claim fails.

### CONCLUSION

For the reasons discussed above, Plaintiff's claims concerning the prison's response to the drop note and the microwave warnings are dismissed for lack of subject matter jurisdiction. His claim that Ingrassia was negligent is dismissed for lack of subject matter jurisdiction or, in the alternative, on summary judgment.  Finally, Defendant's motion for summary judgment is

14

granted with respect to Plaintiff's medical malpractice claims.  **The Clerk of the Court is**

**directed to mail a copy of this Opinion and Order to the Plaintiff, to terminate the motion**

**(Docket No. 62), and to close the case.**


      SO ORDERED.


Dated: April 16, 2013
       New York, New York

                                    _____

                                      JESSE M. FURMAN
                               United States District Judge